UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LONNIE COTTON and DELORES T.
TRUESDALE,
                                                    Case No. 2:06-cv-15208

            Plaintiffs,
                                                    HONORABLE STEPHEN J. MURPHY, III

v.

Corporal TIMOTHY R. SASSAK, Officer
FRIYERSON, Officer HERRIN, and DAN
CADEZ,

            Defendants.
_____/

**OPINION AND ORDER REJECTING IN PART AND ADOPTING IN PART
THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**
(docket no. 98)**, AND GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT** (docket nos. 61 & 74)

**INTRODUCTION**

    This case arises from several police officers' execution of a warrant on a house in

Ecorse, Michigan owned by plaintiff Truesdell,[1] and occupied at the time by herself and her

son, plaintiff Cotton.  Among the officers conducting the raid were defendants Sassak,

Friyerson, and Herrin,[2] who were Ecorse police officers, and defendant Cadez, who was

_____

    [1] In the course of this litigation, this plaintiff's filings have spelled her name both as
"Truesdale," *compare* Compl., docket no. 1., caption ("Truesdale") *with* Response to
Objections to Report & Recommendation, docket no. 103, caption ("Truesdell").  Since
the latter spelling has consistently been used in recent filings, the Court will adopt it
here.  If this is the correct spelling, a formal motion to amend the case caption might be
in order.

    [2] The correct spellings are apparently "Friarson" and "Herring."  Report and
Recommendation ("R&R") at 1, n.1.  The defendants will hereinafter be referred to by
these names.

a Melvindale police officer.  No charges were brought as a result of the search, but Truesdell and Cotton brought this suit alleging five counts: (I) that Sassak violated the Fourth Amendment by executing the warrant after lying to the issuing magistrate in order to obtain it, and that the other officers are also liable because they knew of Sassak's and lies; (II) that defendants violated the Fourth Amendment by failing to knock and announce their presence before entering the home; (III) that defendants violated the Fourth Amendment by using excessive force in conducting the search; (IV) that defendants violated the Fifth and Fourteenth Amendments by intentionally destroying their property during the search, and (V) a state-law claim of gross negligence.  Count V was dismissed without prejudice before the instant motion.  Docket no. 4.

Defendants moved for summary judgment on all counts, and the matter was referred to Magistrate Judge Majzoub, who issued a report and recommendation ("R&R"), Docket no. 98.  On Count I (execution of a warrant obtained by deceiving a magistrate), she recommended granting summary judgment in favor of all defendants except Sassak.  On Count II (failure to knock and announce), she recommended granting summary judgment in favor only of Herring.  On Count III (excessive force), she recommended summary judgment in favor of Herring and Friarson.  On Count IV (destruction of property), she recommended summary judgment in favor of all defendants.  The plaintiffs do not object to any of these recommendations.  Sassak, Cadez and Friarson, however, filed objections to Magistrate Judge Majzoub's refusal to recommend summary judgment for them on all

the counts.[3]   Cadez filed separate objections; the rest of the defendants objected jointly.[4]

Docket nos. 100 & 101.  Plaintiffs responded, Docket nos. 103-04, and Cadez replied,

Docket no. 105.  The motion is before the Court on those objections.

## STANDARD OF REVIEW

A District Court's standard of review for a magistrate judge's report and

recommendation depends upon whether a party files objections.  With respect to portions

of an R&R that no party has objected to, the Court need not undertake any review at all.

*Thomas v. Arn*, 474 U.S. 140, 150 (1985).  On the other hand, Federal Rule of Civil

Procedure 72(b) states, in relevant part:

> The district judge to whom the case is assigned shall make a de novo
> determination upon the record, or after additional evidence, of any portion of the
> magistrate judge's disposition to which specific written objection has been made
> in accordance with this rule. The district judge may accept, reject, or modify the
> recommended decision, receive further evidence, or recommit the matter to the
> magistrate judge with instructions.

Thus, the Court will conduct *de novo* review of the R&R with respect to defendants'

objections.

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment

"shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue

as to any material fact and that the moving party is entitled to judgment as to a matter of

law." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the moving party

---

[3]  Defendant Cadez also purports to object to Magistrate Judge Majzoub's failure to
grant him summary judgment on the deceiving-the-magistrate count.  Cadez obj.,
Docket no. 100, at 2 ¶¶ 2-3.  Since she did in fact grant him summary judgment on that
count, this objection is superfluous.

[4]  Thus, defendant Herring's name also appears on Sassak and Friarson's objection,
even though summary judgment has been granted in his favor on all counts.

demonstrates that there is no genuine issue of material fact regarding the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Martin v. Ohio Turnpike Comm'n*, 968 F.2d 606, 608 (6th Cir.1992).

In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences in a light most favorable to the nonmoving party. *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987). The Court is not required or permitted, however, to judge the evidence or make findings of fact. *Id.* at 1435-36. The moving party has the burden of showing conclusively that no genuine issue of material fact exists. *Id.* at 1435.

A fact is "material" for purposes of summary judgment if proof of that fact would have the effect of establishing or refuting an essential element of the cause of action or a defense advanced by the parties. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.1984). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Accordingly, when a reasonable jury could not find that the nonmoving party is entitled to a verdict, there is no genuine issue for trial and summary judgment is appropriate. *Id.*; *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir.1993).

Once the moving party carries the initial burden of demonstrating that there are no genuine issues of material fact in dispute, the burden shifts to the nonmoving party to present specific facts to prove that there is a genuine issue for trial. *Anderson*, 477 U.S. at 256. To create a genuine issue of material fact, the nonmoving party must present more than just some evidence of a disputed issue. *Matsushita Elec. Indus. Co., Ltd. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 586-87 (1986). As the United States Supreme Court has stated, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmoving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *see Celotex*, 477 U.S. at 322-23; *Matsushita*, 475 U.S. at 586-87.

Consequently, the nonmoving party must do more than raise some doubt as to the existence of a fact; the nonmoving party must produce evidence that would be sufficient to require submission of the issue to the jury. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir.1995).

## FACTS AND ANALYSIS

### I.  Section 1983 and Qualified Immunity

After the magistrate's recommended grants of summary judgment, to which plaintiffs do not object, what remains of the plaintiffs' complaint are allegations that the defendants violated various aspects of the Fourth Amendment to the United States Constitution.  42 U.S.C. § 1983 permits a person who has been subjected "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States by an action taken under color of state law to bring suit against the government official who worked the deprivation.  Obviously then, a key question in every § 1983 case is whether the Constitution or another federal law has been violated.

But the courts have also interpreted § 1983 to include a "qualified immunity" for

government officials who violate constitutional rights that, at the time of violation, were not "so 'clearly established' that a reasonable official would understand that what he is doing violates that right." *Charvat v. E. Ohio Regional Wastewater Authority*, 246 F. 3d 607, 616 (6th Cir. 2001) (citation omitted). To defeat qualified immunity, it is not necessary that "the very action in question has been held unlawful." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see also Lodgson v. Hains*, 492 F. 3d 334, 343 (6th Cir. 2007) ("[p]re-existing law need not address the very question at hand"). What is required is that "in the light of pre-existing law," *Anderson*, 483 U.S. at 640, "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted," *Saucier v. Katz*, 533 U.S. 194, 202 (2001), *quoted in Center for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F. 3d 807, 830 (6th Cir. 2007). In other words, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier*, 533 U.S. at 202, *quoted in Center for Bio-Ethical Reform*, 477 F. 3d at 824. If no reasonably competent officer would have taken the same action, then qualified immunity should be denied; however, "if officers of reasonable competence could disagree on [the legality of the action], immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). To determine whether a right is "clearly established" in this way, a district could must consider "binding precedent from the Supreme Court, the Sixth Circuit, [and] the district court itself," as well as "case law from other circuits which is directly on point." *Barrett v. Harrington*, 130 F. 3d 246, 264 (6th Cir. 1997)

Although there is no longer a legal requirement that a court determine whether the defendants' actions violated a constitutional right before considering whether the right was "clearly established," *Pearson v. Callahan*, 555 U.S. ---, 129 S. Ct. 808, 818-22 (2009), the

Supreme Court has recognized that this is "often beneficial," *id.* at 818, and the Sixth

Circuit has said that the inquiry still "generally proceeds" along those lines. *Drogosch v.*

*Metcalf*, --- F. 3d. ---, No. 08-1249, 2009 WL 454606, at *4 (6th Cir. Feb. 25th, 2009)

II.  Probable Cause

The first remaining claim brought by the plaintiffs is that Officer Sassak lied in order

to obtain a warrant to search their house, even though the true facts did not establish

probable cause for such a search.

A.  Facts

In his affidavit in support of the search warrant, Sassak swore that:

The affiant received information 11/04/2003, from anonymous caller that
stated there is a lot of vehicle traffic at the above listed location and that the
occupants of the residence are selling narcotics from within the location.

That Affiant set up periodical surveillance at the listed location from
11/10/2003 thru 11/28/2003 and observed high amount of vehicle and
pedestrian traffic at the listed location.  Th[at] persons would enter listed
location and stay a short period of time, exit the location and leave.

That on 11/21/2003 affiant collected 3(three) bags of garbage that were
placed between the sidewalk and curb of the above listed location for
scheduled trash pick up.

That he inspected the bags of garbage and discovered coin seals and
cellophane bags containing green leafy residue, stems and seeds and mail
to listed location.

Affiant field tested sample of green leafy material which tested positive for
the presence of Marijuana.

That of 11/28/2003 Affiant collected 2(two) bags of garbage that were
placed between the sidewalk and curb of the above listed location for
scheduled trash pick up.

That he inspected the bags of garbage and again discovered plastic coin
seals and cellophane bags containing green leafy residue, seeds, stems and
mail to residence.

Affiant field tested sample of green leafy material which tested positive for
the presence of Marijuana.

Search warrant and affidavit, docket no. 82-5.

Cotton and Truesdell claim that Sassak knew the statements about conducting the
"trash pulls" to be false at the time he made them.  Cotton has submitted an affidavit
stating that there could not have been any "mail to listed location" in either of the trash
pulls, because he and his mother shredded all of their "personal documents and junk mail"
before throwing it away.  Cotton aff., docket no. 90-9, ¶ 1.  Sassak, however, reiterated
at his deposition in this matter that he had found this kind of "residency" in their trash bags.
Sassak dep. docket no. 74-6, pp. 74-75.

Cotton and Truesdell also note that they used only white 13-gallon trash bags.  Cotton
aff., docket no. 90-1, ¶ 2.  While Sassak's affidavit does not indicate the appearance of the
trash bags that were assertedly pulled, at his deposition Sassak stated that the bags
involved in the November 21st pull were black 20-gallon bags.  Sassak dep., docket no
74-6, pp. 38-39.  Finally, the plaintiffs flatly deny that there was any marijuana in their
garbage.  Cotton aff., docket no. 90-1, ¶ 7; Truesdell aff., docket no. 90-12, ¶ 12.  All these
discrepancies, say plaintiffs, demonstrate that the trash pulls actually never occurred.

B.  Procedural Posture

The plaintiffs also presented evidence that the surveillance that Sassak swore to
never occurred.  Magistrate Judge Majzoub, however, recommended a finding that the
evidence indicates that the surveillance indeed took place, and that no issue of fact
remains as to that question.  Plaintiffs have not filed an objection to this conclusion, and
the Court therefore will not revisit it.  Based on the evidence calling into question Sassak's

account of the details of the trash pulls, however, the magistrate did recommend finding

that a fact question remains as to whether those pulls actually took place.  Without that

evidence, she concluded, there was no probable cause to support the warrant.

Sassak appears to offer two objection to this recommendation.  First, he argues that

Cotton and Truesdell have not generated a fact issue as to whether he lied in obtaining

the warrant.  Second he seems to claim that even if a jury were to conclude that the trash

pulls never occurred, the search would still be supported by probable cause based on the

tip and the surveillance.

C.  Analysis

1.  Governing Law

The Fourth Amendment requires that "no warrants shall issue, but upon probable

cause."  In interpreting this provision, the Supreme Court has held that the information

presented in support of a search warrant must be "believed or appropriately accepted by

the affiant as true."  *Franks v. Delaware*, 438 U.S. 154, 165 (1978).  Thus, in the context

of criminal prosecutions, a warrant must be voided, and evidence obtained in a search

purportedly conducted pursuant to it must be suppressed as unlawfully obtained, if (1) "a

false statement knowingly and intentionally, or with reckless disregard for the truth, was

included by the affiant in the warrant affidavit," and (2) "with the affidavit's false material

set to one side, the affidavit's remaining content is insufficient to establish probable

cause."  *Id.* at 155-56.

Similarly, a defendant in a § 1983 suit accused of an unlawful search "cannot rely on

a judicial determination of probable cause [justifying the search] if that officer knowingly

ma[de] false statements and omissions to the judge such that but for these falsities the

judge would not have issued the warrant." *Yancey v. Carroll County, Ky.*, 876 F. 2d 1238,

1243 (6th Cir. 1989). In applying this test, the *Yancey* court considered actual deposition

testimony from the judges who issued the challenged warrants, on the topic of whether

those judges would have issued the warrants in the absence of the alleged false

statements in the affidavits. *Id.* at 1244-45. In other cases the Sixth Circuit has treated

the inquiry simply as "whether the accurate portions of [the] testimony suffice to establish

probable cause." *Vakilian v. Shaw*, 335 F. 3d 509, 518 (6th Cir. 2003).[5] "What remains of

the affidavit established probable cause if it provides the magistrate judge with a basis for

finding there was a fair probability that contraband or evidence of a crime would be found

at the stated location." *United States v. Mastromatteo*, 538 F. 3d 535, 545 (6th Cir. 2008)

(citation, internal quotation marks and alteration omitted).

The Sixth Circuit has treated the existence of the *Franks* factors – knowing falsehood

plus a lack of probable cause when that falsehood is deleted from the affidavit – as also

defeating any assertion of qualified immunity on the part of a § 1983 defendant. The

*Vakilian* court stated that "[t]o overcome an officer's entitlement to qualified immunity, . .

. a plaintiff must establish: (1) a substantial showing that the defendant stated a deliberate

falsehood or showed reckless disregard for the truth and (2) that the allegedly false or

omitted information was material to the finding of probable cause." *Vakilian*, 335 F. 3d at

517. In fact, although *Vakilian* thus clearly establishes the elements required to overcome

the qualified immunity defense, and the Sixth Circuit has addressed false affidavits in the

context of § 1983 claims on several other occasions, the Court has been unable to find

any Sixth Circuit case that clearly deals instead with the elements of the constitutional

---

[5] *Vakilian* dealt with the validity of an arrest warrant, not a search warrant, but
apparently did so under an identical doctrinal standard.

violation itself.[6]  *Franks,* however, seems clear that these two factors are also the sole constituents of the Fourth Amendment violation.

Thus, it appears that in this Circuit an officer accused of violating the Fourth Amendment by obtaining a warrant through an affidavit known to be false can enjoy qualified immunity from suit under § 1983 only if he in fact did not violate the Fourth Amendment.  *Vakilian* itself seems to contemplate as much.  In that case, shortly after identifying the *Franks* factors as sufficient to overcome a claim of qualified immunity, the court considered whether the question of materiality should have been submitted to a jury. In doing so, it noted *Hill v. McIntyre*, 884 F. 2d 271, 275 (6th Cir. 1989) a previous case in which the Sixth Circuit had stated simply that "[a]n action under § 1983 does lie against an officer" when the *Franks* factors are present, and remanded for a jury trial on the materiality question.   The *Vakilian* court reasoned that this was proper only because in *Hill*, "qualified immunity was not at issue," *Vakilian*, 335 F. 3d at 517, suggesting that the *Franks* factors governed the constitutional question as well.

### 2.  Alleged Misrepresentations in the Affidavit

As noted, to recover for a search conducted pursuant to a warrant obtained by

---

[6]  *See, e.g., Donta v. Hooper*, 774 F. 2d 716, 718 (6th Cir. 1985) (examining different standards for *liability*, without differentiating between qualified immunity and the underlying constitutional violation); *Yancey v. Carroll County, Ky.*, 876 F. 2d 1238, 1243-44 (6th Cir. 1989) (citing the *Franks* factors as exceptions to the general rule that "[p]olice officers are entitled to rely on a judicially secured warrant for immunity from a § 1983 action"); *Sinick v. County of Summit*, 76 Fed. Appx 675, 682 (quoting *Yancey* and noting that an officer "faces liability" if the *Franks* factors are present); *Peet v. City of Detroit*, 502 F. 3d 557, 570 (6th Cir. 2007) (noting that "an officer may be held liable under 42 U.S.C. § 1983" when the *Franks* factors are present); *Buda Bros., Inc. v. Walsh*, 22 F. App'x. 423, 432-33 (6th Cir. 2001) (*Franks* factors are required to challenge "[t]he sufficiency of a judicially authorized search warrant"); *Packer v. City of Toledo*, 1 F. App'x 430, 433-34 (6th Cir. 2001) (affirming finding of qualified immunity based on immateriality of falsehoods in affidavit).

misrepresenting the magistrate, under *Vakilian* a § 1983 plaintiff is required to make a "substantial showing" that the defendant knowingly misrepresented the facts in his affidavit.  Here, Sassak claims that Cotton and Truesdell have not made such a showing, and thus that he is entitled to qualified immunity.

The Court agrees with Magistrate Judge Majzoub that plaintiffs have made a substantial showing that in his affidavit, Sassak knowingly misrepresented the presence of mail in the trash bags.  At his deposition, Sassak himself acknowledged that it is important to find mail addressed to a suspect residence in a trash pull, "because if the bag contains residency from that location, that means that more than likely the products that are inside of this garbage bag came from within that location as well."  Sassak dep., docket no. 74-6, pp. 74-75.  Thus, the presence or absence of such mail in the trash bags would likely have stood out in Sassak's mind as he swore out the affidavit.  Cotton has sworn that there would have been no documents with an identifiable address on them in the trash bags, because he and his mother would have shredded all such documents.  If this is true  -- and a could jury could reasonably find that it is -- then it seems likely that the affidavit's statement as to the presence of the mail was simply fabricated.

The Court does not find plaintiffs to have made a substantial showing of falsehood with respect to other aspects of Sassak's warrant application.  Cotton testified that he and his mother used white 13-gallon trash bags, whereas Sassak recalled the bags as being black and 20-gallon sized.  As a preliminary matter, the Court regards the discrepancy as to the size of the bags to be of little significance.  Even if Sassak was wrong by seven gallons about what size garbage bags Cotton and Truesdell used, it remains much more likely that he simply overestimated the capacity of the trash bags that he pulled than that

he never pulled them at all (or that he mistakenly pulled someone else's 20-gallon bags).

The disagreement in the evidence about the color of the bags, however, is potentially more serious.  If a police officer were to state in his warrant application that he found marijuana residue in black trash bags, but the plaintiffs then protested that their trash bags were white, they would certainly have generated a jury question as to whether the officer intentionally misled the magistrate as to whether the trash pull even took place.  In this case, Sassak's affidavit to the magistrate said nothing at all about the color of the bags. His deposition testimony that the bags were black came in October of 2007, nearly four years after he stated that the trash pull occurred in November of 2003.  *Compare* Sassak dep., docket no. 74-6, cover page, *with* Search Warrant and Affidavit, docket no. 82-5. Under these circumstances, Sassak's inability to correctly recall the color of the trash bags he says he pulled off the curb does not cast serious doubt on his veracity as to whether he conducted the search.  Similarly, the plaintiffs' conclusory denials that there was marijuana in their home or in their trash lack sufficient substance to seriously call into question the veracity of the affidavit.

Thus, an issue of fact remains as to whether, in procuring the search warrant, Sassak knowingly misrepresented that the trash bags contained mail addressed to Cotton and Truesdell.  It remains to be determined whether this issue is a material one -- that is, whether resolving the fact question in favor of the plaintiffs would permit a jury to render a verdict for them.  Under *Franks* and *Yancey*, this is determined by considering whether the potentially fabricated portions of the affidavit were material to the existence of probable cause for the search.  To do this, the Court must redact the affidavit to exclude the suspect portions.  Because the Court has found there to be fewer substantial questions as to the

affidavit's veracity, however, its redaction will be less extensive than Magistrate Judge Majzoub's.  More specifically, in the Court's opinion there is no substantial issue of fact as to whether Sassak was acting in good faith when he swore that he pulled the trash bags off the curb in front of plaintiffs' house, and found marijuana residue inside the bags. Therefore, the Court finds that the only portion of the affidavit that must be "set to one side" under *Franks* is Sassak's statement that he found mail addressed to the plaintiffs inside the trash bags.

Even when considered without this statement, the Court finds that the affidavit establishes probable cause for the search.  The plaintiffs do not contest the accuracy of Sassak's averment that he received an anonymous tip about drug activity at their address. Further, they do not object to Magistrate Judge Majzoub's conclusion that there is no substantial issue as to Sassak's good faith in averring that he conducted periodic surveillance of the house over a period of some weeks, and observed heavy foot traffic consistent with the sale of drugs.  Finally, the Court finds no serious question as to Sassak's good faith in attesting that he pulled the trash found in front of the house on two separate occasions, and each time found marijuana residue in the trash.  Taken together, these facts amply establish "a fair probability that contraband or evidence of a crime would be found at the stated location."  *United States v. Mastromatteo*, 538 F. 3d 535, 545 (6th Cir. 2008).  Therefore, the issue of fact as to whether the bags contained unshredded mail is not a material one: probable cause existed for the search, and Sassak is entitled to qualified immunity from suit based on it.  As a result, summary judgment in his favor is appropriate on this issue.

II.  Knock and Announce

A.  Overview.

Cadez, Sassak and Friarson also object to Magistrate Judge's Majzoub's recommendation that they be denied summary judgment on plaintiffs' claim that they failed to knock on plaintiffs' door and announce their presence before entering the house. Although the other officers had no specific recollection, Sassak testified that they knocked on the door and announced their presence before entering Truesdell's and Cotton's house. Sassak dep., docket no. 74-6, pp. 49, 83.

As one would expect, Truesdell and Cotton contest this.  Cotton, however, was by his own account asleep in an upstairs bedroom at the time of the entry, Cotton dep., docket no. 82-3, p. 52, and thus his inability to hear a knock does not create a fact question as to whether one occurred.  *See U.S. v. Miller*, 21 F. App'x 397, 400-01 (6th Cir. 2001) (affirming grant of summary judgment in favor of police on knock-and-announce claim where, although occupants of the house testified they did not hear a knock, they all admitted they were asleep at the time of entry).  Truesdell, on the other hand, was lying on a couch in the living room of the house at the time of the entry, with her head only two and a half feet from the door.  She also testified that she was either asleep or trying to go to sleep at the time the entry occurred.  Evidence on this issue will be examined in more detail below.

B.  Procedural Posture

Magistrate Judge Majzoub first noted that Truesdell does not claim that defendant Herring was present at the front door when the entry occurred.   Therefore, she recommended granting summary judgment in his favor on this count.  The magistrate judge also concluded that Truesdell's and Sassak's testimony directly conflict on the

question of whether a knock and announcement actually took place, and thus recommended denying summary judgment as to the rest of the defendants.  In response to this, Cadez argues that Truesdell has not specifically stated that no knock occurred, and thus that no issue of fact exists on the question.  In addition, Cadez, Sassak and Friarson all object that, on Truesdell's own testimony, she was too drowsy to have been able to hear a knock and announcement of police presence.

C.  Analysis

Despite Cadez's objection as to the lack of such evidence, plaintiff Truesdell did testify that she heard no knock or announcement before the police entered her home.  The relevant portion of her deposition transcript, which Magistrate Judge Majzoub noted, R&R at 11, reads as follows:

> Q. I am speaking of this date in November of 2003, when the Ecorse Police and when (sic) the Melvindale Officer came to your house, did you hear anyone knock on the door, prior to them coming in?
> A. No.
> Q. Did you hear--
> A. I didn't know nobody was coming.  If they would have knocked, I'd have let them in. . . .
> Q. And did you hear – Before you saw the officers, did you hear anyone say police?
> A. No.

Truesdell Dep., Docket no. 90-4, p. 159.  Combined with Truesdell's testimony that her head was two and a half feet from the door when the entry occurred, R&R at 11, Docket no. 90-4, at 95-97, this clearly supports the proposition that no knock occurred.[7]

In light of this testimony, the only way to make sense of Cadez's objection is to

---

[7] The Court declines to draw a metaphysical distinction between testimony that the witness did not hear a knock despite her head being two and a half feet from the door, and conclusive testimony that no knock occurred.  There are few more persuasive methods of proving a negative than demonstrating that one had a clear opportunity to observe an occurrence, but in fact did not observe it.

construe it  as an argument that plaintiffs had adduced no *credible* evidence as to the absence of a knock, because Truesdell equivocated in her deposition testimony as to whether or not she was asleep when Sassak claims the knock occurred.  This argument is identical to the objection lodged by the other defendants, and it is not an insubstantial one.  Truesdell's initial testimony was that at the time of the entry she had just gone to sleep, Docket no. 90-4, at 103, and that the entry woke her.  *Id.* at 104.  If Truesdell was in fact asleep at the time Sassak testified that he knocked on the door, her testimony that she did not hear a knock would be significantly less probative of whether a knock actually occurred.[8]  As Magistrate Judge Majzoub noted, shortly after saying that she had just fallen asleep, Truesdell corrected herself and twice said that she had instead been "trying to go to sleep."  R&R at 11, Truesdell Dep., docket no 90-4 at 105.  When asked in response if she was changing her earlier testimony, however, her response was "either way you want it," *id.*, and shortly thereafter she agreed that "I had just gotten to sleep," *id.* at 106.  By contrast, her affidavit states that she was "trying to fall asleep."  Docket 90-12, ¶ 11.

But despite its ambiguity, this testimony does create an issue of material fact as to whether the knock occurred.  Plaintiff Truesdell's words can be interpreted in either of two ways.  As is suggested by her "either way you want it," Truesdell dep., docket no. 90-4, p. 105, she may have regarded having "just gotten to sleep" and "trying to go to sleep" as phrases that are not mutually exclusive when used in a broad sense.  Under this

---

[8]  Plaintiffs speculate that even if Truesdell was asleep, the fact that she was not awakened by a knock on the door indicates that none occurred.  It seems unlikely that this inference alone could generate a genuine issue of fact on this point if it were clear that Truesdell was really asleep, but since it is not, there is no need to decide the question now.

understanding, her testimony that she had "just gotten to sleep" would be equivalent to a loose statement that she was "trying to go to sleep." *Compare id.* at 103-04, 106 *with id.* at 105. Alternatively, her deposition testimony could simply be understood as self-contradictory – as admitting that she was asleep before the entry, but then first claiming that she was awake at that time, secondly collapsing back into her earlier position, and finally reasserting in her affidavit that she was awake.[9]

Neither of these readings, however, compels the conclusion that Truesdell was in fact asleep; at most, her testimony is internally inconsistent on the question. Thus, based on her testimony a reasonable jury could find (1) that Truesdell was awake at the time Sassak says he knocked on her door and (2) that she heard no knock despite being two and a half feet from the door. If believed, this evidence would make out a Fourth-Amendment violation, since there is no evidence of any exigent circumstances that might justify an unannounced entry. Moreover, as it is very clearly established that "[u]nder the Fourth Amendment, officers must knock and announce their presence and authority before entering a private residence," *Ingram v. City of Columbus*, 185 F. 3d 579, 588 (6th Cir. 1999), qualified immunity is not available for a violation such as the one alleged by the plaintiffs here. Therefore, Magistrate Judge Majzoub correctly recommended that this issue of material fact precludes summary judgment on the failure-to-knock-and-announce claim.

III.  Excessive Force

Cadez and Sassak object to the magistrate's recommendation that they be denied

---

[9]  The affidavit is not dated, and so it is impossible to determine conclusively that Truesdell signed it after her deposition. She was deposed on May 22nd, 2007, and both her deposition transcript and her affidavit were attached as exhibits to her response to defendants' motion for summary judgment, which response was filed on May 5th, 2008.

summary judgment on plaintiffs' claim that they used excessive force in conducting the search.

A.  Facts

Plaintiff Delores Truesdell is in her seventies, and her son Lonnie Cotton appears to be in his fifties.  He experiences some difficulty moving at times due to arthritis.  The plaintiffs' testimony as to what happened during the search, especially Truesdell's, is in many respects rambling, confused, and potentially self-contradictory.  Nevertheless, through their depositions and affidavits the plaintiffs have fairly adduced testimony as to Sassak's and Cadez's actions.  These facts , which follow, are disputed in almost every respect by the defendants.

Sassak and Cadez, as well as the other defendants Friarson and Herring, were part of a group of several officers that broke down Truesdell's door and entered the house wearing masks, with weapons drawn.   Truesdell Dep., docket no 90-4, at 104.  Immediately on entry they encountered Truesdell, who was lying on the couch, and when she started to raise her head one of the officers shouted that he would blow it off unless she stopped.  *Id.* at 107.  Sassak and several other officers, but not Cadez, pointed their guns at her.  *Id.* at 160, 172-73.  Although the police did not disclose who they were or why they were there, *id.* at 174, Friarson and Herring were in uniform, Truesdell Dep., docket no 90-4, at 114; *see also* Comp., docket no. 1, ¶¶ 6-7, and  at some point Sassak accused Truesdell of being a drug dealer, Truesdell dep. at 114.  After entering, Sassak and Cadez uncovered their faces and asked Truesdell if there was anyone else in the house.  *Id.* at 113, 160.  She responded that her son (i.e., Cotton) was there, and they put their caps back down, id. at 114, 160, and "ran upstairs," *id.* at 109.

Cotton had been sleeping upstairs, and was starting to get out of bed (slowly, because of his arthritis) when Sassak and Cadez came into the room, masks on and fingers on their gun triggers.  Cotton dep., docket no. 90-3, pp. 53, 64.  Sassak gave orders along the lines of "put your f***ing arms up, and don't f***ing move, or I'll shoot you," *id.* at 54, and Cadez repeated these orders, *id.* at 105.  When Cotton put his arms up, he lost his balance and "fell back in the bed."  Either Sassak or Cadez said "I told you not to move," held a gun over Cottton, and told him to "put your arms up and get up."  Cotton tried to explain that he needed to use his arms to get up, but eventually managed to get out of bed with his hands up.  *Id.* at 54-55.  Cotton asked if he might put his glasses on; either Sassak or Cadez told him he could not.  *Id.* at 56-57.  They then told Cotton, who was bare-chested, to "keep [his] hands up, and walk through the hallway into the living room," *id.* at 58, where he saw uniformed police officers for the first time, *id.* at 60.  This was "probably a couple of minutes," *id.* at 135, or "three to four minutes, maybe," *id.* at 60, after Cotton awoke.

Sassak and Cadez brought Cotton downstairs, Truesdell Dep., docket no 90-4, p. 166, and from there the two officers apparently began operating more independently of each other.   For the next "10 to 15 minutes," Sassak repeatedly ordered Cotton to "keep [his] hands up and don't f'g [sic] move," *id.* at 128, although after "a few minutes . . . five maybe" Cotton was permitted to sit down, *id.* at 59, and "after awhile," one of the uniformed officers (again, either Friarson or Herring, Compl., docket no. 1, ¶¶ 6-7) brought him his glasses and cigarettes, Cotton dep., docket no. 90-3 at 65.   Truesdell had her hands up, but after "a few moments" she was allowed to lower them.  *Id.* at 128.  About five minutes after Cotton sat down Sassak and Cadez removed their hoods, *id.* at 105-06,

revealing their faces to Cotton for the first time.  Finally one of the uniformed officers told Cotton he could lower his hands.  *Id.* at 129-30.

Sassak photographed Cotton and Truesdell– the latter with difficulty, because she continuously hid her face from the camera.  *Id.* at 124.  At some point during the raid, despite Cotton's pleas that he use more civil language, Sassak began a "tirade" against Truesdell.  Standing very close to her, *id.* at 122, he made multiple threats to arrest her, Cotton aff., docket no. 90-9,  ¶ 14, and said: "we're gonna to put your old f***in' a** out on the street," "we'll take everything your old f***ing a** owns," "you didn't do a very f***ing good job raising them [i.e., Truesdell's children]," "you're running an f'g [sic] dope house," Cotton dep., docket no. 90-3 at 122-23, "you're nothing but a motherf***er," and  "I'm gonna  take your f-ing house."  Truesdell dep., docket no. 904, p. 163.  When Cotton asked Sassak to ease off of his mother due to her health, Sassak responded "I don't give a f***."  Cotton aff. at ¶ 14. To Cotton, Sassak said "f*** you, we know what's going on, this is a f***ing drug house" and "I'll put your momma on the street."  *Id.*  The officers searched portions of the house and a vehicle parked outside, id. at 124-25, and as the search progressed Sassak's voice got louder and "the 'F' words were flying more."  Cotton dep., docket no. 90-3, p. 128.  Throughout the process he acted "a wild man," Truesdell Dep., docket no 90-4, at 164-65;  "He was crazy, he was absolutely nuts," speaking in a loud and unprofessional tone "the whole time." *Id.* at 168-69.  When Cotton asked if he could see a warrant, Sassak responded that he would leave the warrant in the other room, and that Cotton could look at it after the police left.  *Id.* at 165.

Cadez, on the other hand, questioned Cotton about Cotton's nephew, Cotton dep., docket no. 90-3, pp. 106-07, who Cadez apparently bore a grudge against because

Cotton's nephew and Cadez's son had once tried to run away together, *id.* at 110-11. Cotton asked Cadez not to sit on the arm of Truesdell's chair, but Cadez did not move. *Id.* at 112. Cadez "wasn't over the ballpark like Officer Sassak," and raised his voice only once. *Id.* at 108. Cadez never spoke directly to Truesdell, Truesdell Dep., docket no 90-4, at 131-34, did not point a weapon at her, *id.* at 171, and said nothing that Truesdell thought inappropriate, except that "we'll get more than $900 out of this one," *id.* At one point he started to search Truesdell's purse, but stopped when she asked him to. *Id.* at 171.

### B. Procedural Posture

Magistrate Judge Majzoub first noted that Cotton and Truesdell make no allegations that either Herring or Friarson used force in any way. Therefore, she recommended granting summary judgment as to them on this claim. On the other hand, the magistrate concluded that, based on Cotton's and Truesdell's testimony as to their actions, a jury could find that Officers Cadez and Sassak did use unreasonable force. Therefore, she recommended denying summary judgment as to them.

In objection, Cadez and Sassak do not appear to challenge the magistrate's conclusions as to what factual findings would be supported by the evidence. Instead, they seem to argue that even on those facts, their use of force was not "unreasonable" as a matter of law.

### C. Analysis

#### 1. Governing Law

"[F]or Fourth Amendment purposes . . . a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of

the premises while a proper search is conducted." *Michigan v. Summers*, 452 U.S. 692, 705 (1981).  Under *Graham v. Connor*, 490 U.S. 386, 395 (1989), "all claims that law enforcement officers have used excessive force-deadly or not-in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard."  Thus, the use of force by the officers in this case is properly analyzed under this rubric.

In determining whether a use of force is "reasonable" under the Fourth Amendment, a court must consider the totality of the circumstances that faced the officer, *Fox v. DeSoto*, 489 F. 3d 227, 236-37 (6th Cir. 2007), and balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake," *Graham v. Connor*, 490 U.S. at 396.  Among the relevant circumstances are "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.* (quotation marks and citation omitted)*.*

> [t]he "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . .  "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment.  The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments– in circumstances that are tense, uncertain, and rapidly evolving– about the amount of force that is necessary in a particular situation.

*Id.* at 396-97 (quoting *Johnson v. Glick*, 481 F. 2d 1028, 1033 (2d Cir. 1973).

The Supreme Court has elaborated that  "[e]xcessive force claims, like most other Fourth Amendment issues, are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred."  *Saucier*, 533 U.S. at 207.

Therefore, "[i]f an officer reasonably, but mistakenly, believed that a suspect was likely to fight back . . . the officer would be justified in using more force than in fact was needed." *Saucier*, 533 U.S. at 205.

Here, the circumstances indicated that Cadez and Sassak were entering a potentially dangerous situation. There is no dispute that none of the officers knew who lived in the house they were raided, or had any reason to know that its only occupants were two relatively elderly persons. Thus, given the evidence of drug sales at that address, it was not unreasonable for the officers to act in an assertive manner in order to quickly detain the house's occupants and preclude the possibility of violent resistance to their search. Within a relatively short time of entering the house, the officers would have been able to see that neither Truesdell nor Cotton appeared to pose any serious threat of either resisting or destroying evidence. Thus, the level of force that would be permissible to maintain their detention throughout the search would be considerably less than what was reasonable immediately upon entry.

### 2. Officer Cadez

The Court finds that, even reading the record in the light most favorable to Cotton and Truesdell, the facts indicate that defendant Cadez calibrated his use of force to the circumstances in precisely this manner. It was not unreasonable for Cadez to enter a suspected drug house with his gun drawn or with a mask over his face. There is no dispute that Cadez quickly unmasked himself after encountering Truesdell, and that he did not point his weapon at her. In light of the fact that Cadez had no knowledge of Cotton's limited mobility due to his arthritis, it was also reasonable for Cadez to enter Cotton's bedroom once again masked and with his gun ready to fire, and to use rough language

with Cotton to quell the possibility of his resistance.  Even after Cotton fell back into his bed, the Court cannot fault Cadez for requiring Cotton to immediately proceed downstairs without permitting him to put on a shirt or his glasses.  Although Cadez probably knew at this point that Cotton was not in perfect fighting form, allowing Cotton to rummage around in closets or drawers for clothes or glasses could still have quite reasonably seemed tantamount to an invitation to produce a weapon and offer violent resistance.

After Cotton arrived in the living room, however, the record indicates that Cadez moderated his use of force significantly.  In fact, there is almost no indication that he used force of any kind after coming back downstairs from Cotton's bedroom.  The plaintiffs acknowledge that he spoke in a calm, even polite manner.  He apparently spoke with Cotton during the 10- to 15-minute period while Cotton's hands were up, and did not give Cotton permission to lower them.  The record indicates that it was Sassak, not Cadez, who insisted that Cotton's hands stay in the air during this period.  The Court does not regard Cadez's failure to tell Cotton that he could lower his hands as being unreasonable under the Fourth Amendment.

Therefore, the Court concludes that there is no remaining issue of material fact as to whether defendant Cadez conducted himself unreasonably, under the Fourth Amendment, in the course of seizing the plaintiffs and searching their home.  Accordingly, summary judgment will be entered in Cadez's favor on this issue.


### 3.  Officer Sassak

The plaintiffs' testimony paints defendant Sassak's behavior in an entirely different light.  Although his actions in entering the house and rousting Cotton from bed were similar

to Cadez's, the plaintiffs assert that Sassak continued conducting himself in the same threatening, violent manner for an extended period of time after entering the house. Nothing about the circumstances indicated the need for requiring Cotton to hold his hands up for fifteen minutes, for launching into extended tirade of shouted profanities, or for repeatedly threatening to kick Truesdell out of her house and expressing indifference to whether his conduct was damaging her health. The violence of their initial entry, although reasonable in itself, further suggests that Sassak's further actions can best be characterized as a needless terrorization of two frightened elderly persons. Because a jury could reasonably believe the plaintiffs' assertions that Sassak did all these things, it could reasonably find that his conduct of the search and seizure was "unreasonable" under the Fourth Amendment.

There can be no question that the right to be free of excessively forceful searches and seizures is clearly established. The Court is also satisfied that a reasonable officer would have understood that the sort of rampage that Cotton and Truesdell claim Sassak engaged in is not permitted under the Fourth Amendment. Therefore, an issue of fact also remains as to whether Sassak is entitled to qualified immunity, and summary judgment in his favor on the excessive-force claim is not appropriate at this time.

## CONCLUSION AND ORDER

The Court accepts Magistrate Judge Majzoub's recommendation to find that an issue of fact remains as to whether Sassak found mail addressed to Cotton and Truesdell in the trash bags on their curb. The Court does not find, however, that any issues of fact exist as to whether the trash was pulled off their curb, or whether it actually yielded marijuana. In this light, the question of whether the trash bags contained unshredded mail is not

material: probable cause would have existed to support the search even if a jury resolved this issue in favor of plaintiffs.  Therefore, the Court will accept the Report and Recommendation insofar as it grants summary judgment for Cadez on this issue, and modify it to grant summary judgment for Sassak as well.

The Court adopts in full Magistrate Judge Majzoub's recommendations in regard to the knock-and-announce claim.  A genuine issue fact remains as to whether the officers knock and announced their presence.  If they did not, it was a violation of the Constitution. Therefore, summary judgment for Cadez, Sassak, and Friarson will be denied on this issue.  Since Herring was undisputedly not part of the initial entry party, summary judgment will be granted in his favor in this respect.

The Court also adopts Magistrate Judge Majzoub's recommendations as to defendant Sassak on the excessive-force claim.  An issue of fact remains as to whether his conduct comported with Fourth Amendment reasonableness.  As no such issue of fact remains with respect to Officer Cadez, however, the Court will modify the Report and Recommendation to grant summary judgment in his favor on this issue.

**WHEREFORE**, it is hereby **ORDERED** that:

the Report and Recommendation is **ADOPTED**, as **MODIFIED** herein;

defendants' motions for summary judgment are **GRANTED IN PART** and **DENIED IN PART**, as follows:

With respect to Count I, regarding the existence of probable cause for the search, summary judgment is **GRANTED** in favor of all defendants;

With respect to Count II, regarding the defendants' alleged failure to knock and announce their presence, summary judgment is **GRANTED** in favor of defendant Herring, and **DENIED** to defendants Cadez, Sassak, and Friarson;

With respect to Count III, regarding the use of excessive force, summary judgment is **GRANTED** in favor of defendants Cadez, Friarson, and Herring, and **DENIED** to defendant Sassak; and

With respect to Count IV, regarding due process, summary judgment is **GRANTED** in favor of all defendants.

Summary judgment having been granted in his favor on all claims, defendant Herring will be dismissed from the case.

**SO ORDERED.**


s/Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated:  March 25, 2009

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on March 25, 2009, by electronic and/or ordinary mail.

s/Alissa Greer_____
Case Manager