UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LONNIE COTTON and DELORES T.
TRUESDELL,                                    Case No. 2:06-cv-15208

        Plaintiffs,                        HONORABLE STEPHEN J. MURPHY, III

v.

Corporal TIMOTHY R. SASSAK, Officer
FRIYERSON, Officer HERRIN, and DAN
CADEZ,

        Defendants.
_____/

**OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR
RECONSIDERATION** (docket no. 114)**, WITHDRAWING  THE OPINION
AND ORDER OF APRIL 9TH** (docket no. 110)**,  MODIFYING AND ADOPTING THE
MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION** (docket no. 98)**, AND
GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR
<u>SUMMARY JUDGMENT</u>** (docket nos. 61 & 74)

**INTRODUCTION**

    This case arises from several police officers' execution of a warrant on a house in

Ecorse, Michigan owned by plaintiff Truesdell, and occupied at the time by herself and her

son, plaintiff Cotton.  Among the officers conducting the raid were defendants Sassak,

Friyerson, and Herrin,[1]  who were Ecorse police officers, and defendant Cadez, who was

a Melvindale police officer.  No charges were brought as a result of the search, but

Truesdell and Cotton brought this suit alleging five counts: (I) that Sassak violated the

Fourth Amendment by executing the warrant after lying to the issuing magistrate in order

_____

   [1] The correct spellings are apparently "Friarson" and "Herring."  Report and
Recommendation ("R&R") at 1, n.1.  The defendants will hereinafter be referred to by
these names.

to obtain it, and that the other officers are also liable because they knew of Sassak's lies; (II) that defendants violated the Fourth Amendment by failing to knock and announce their presence before entering the home; (III) that defendants violated the Fourth Amendment by using excessive force in conducting the search; (IV) that defendants violated the Fifth and Fourteenth Amendments by intentionally destroying their property during the search, and (V) a state-law claim of gross negligence.  Count V was dismissed without prejudice before the instant motion.  Docket no. 4.

Defendants moved for summary judgment on all counts, and the matter was referred to Magistrate Judge Majzoub, who issued a report and recommendation ("R&R"), Docket no. 98.  On Count I (execution of a warrant obtained by deceiving a magistrate), she recommended granting summary judgment in favor of all defendants except Sassak.  On Count II (failure to knock and announce), she recommended granting summary judgment in favor only of Herring.  On Count III (excessive force), she recommended summary judgment in favor of Herring and Friarson.  On Count IV (destruction of property), she recommended summary judgment in favor of all defendants.  The plaintiffs do not object to any of these recommendations.  Sassak, Cadez and Friarson, however, filed objections to Magistrate Judge Majzoub's refusal to recommend summary judgment for them on all the counts.[2]  Cadez filed separate objections; the rest of the defendants objected jointly.[3]  Docket nos. 100 & 101.  Plaintiffs responded, Docket nos. 103-04, and Cadez replied,

---

[2]  Defendant Cadez also purports to object to Magistrate Judge Majzoub's failure to grant him summary judgment on the deceiving-the-magistrate count.  Cadez obj., Docket no. 100, at 2 ¶¶ 2-3.  Since she did in fact grant him summary judgment on that count, this objection is superfluous.

[3]  Thus, defendant Herring's name also appears on Sassak and Friarson's objection, even though summary judgment has been granted in his favor on all counts.

Docket no. 105.

The motion came before the Court on those objections. The Court adopted Magistrate Judge Majzoub's Report and Recommendation, but modified it so as to additionally grant summary judgment for Sassak on Count I, and for Cadez on Count III. Docket no. 110. Plaintiffs then moved for reconsideration of this order with respect to the grant of summary judgment for Sassak on Count I. Docket no. 114. After careful consideration, the Court agrees that Magistrate Judge Majzoub's analysis of this issue was correct, and will adopt this portion of her Report and Recommendation as well. Accordingly, the Court's opinion and order of April 4th, 2009 is withdrawn, and replaced with the following.

## STANDARD OF REVIEW

A District Court's standard of review for a magistrate judge's report and recommendation depends upon whether a party files objections. With respect to portions of an R&R that no party has objected to, the Court need not undertake any review at all. *Thomas v. Arn*, 474 U.S. 140, 150 (1985). On the other hand, Federal Rule of Civil Procedure 72(b) states, in relevant part:

> The district judge to whom the case is assigned shall make a de novo determination upon the record, or after additional evidence, of any portion of the magistrate judge's disposition to which specific written objection has been made in accordance with this rule. The district judge may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate judge with instructions.

Thus, the Court will conduct *de novo* review of the R&R with respect to defendants' objections.

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue

as to any material fact and that the moving party is entitled to judgment as to a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue of material fact regarding the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Martin v. Ohio Turnpike Comm'n*, 968 F.2d 606, 608 (6th Cir.1992).

In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences in a light most favorable to the nonmoving party. *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987). The Court is not required or permitted, however, to judge the evidence or make findings of fact. *Id.* at 1435-36. The moving party has the burden of showing conclusively that no genuine issue of material fact exists. *Id.* at 1435.

A fact is "material" for purposes of summary judgment if proof of that fact would have the effect of establishing or refuting an essential element of the cause of action or a defense advanced by the parties. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.1984). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Accordingly, when a reasonable jury could not find that the nonmoving party is entitled to a verdict, there is no genuine issue for trial and summary judgment is appropriate. *Id.*; *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir.1993).

Once the moving party carries the initial burden of demonstrating that there are no genuine issues of material fact in dispute, the burden shifts to the nonmoving party to present specific facts to prove that there is a genuine issue for trial. *Anderson*, 477 U.S.

at 256. To create a genuine issue of material fact, the nonmoving party must present more than just some evidence of a disputed issue. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). As the United States Supreme Court has stated, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmoving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *see Celotex*, 477 U.S. at 322-23; *Matsushita*, 475 U.S. at 586-87.

Consequently, the nonmoving party must do more than raise some doubt as to the existence of a fact; the nonmoving party must produce evidence that would be sufficient to require submission of the issue to the jury. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir.1995).

### FACTS AND ANALYSIS

I.  Section 1983 and Qualified Immunity

After the magistrate's recommended grants of summary judgment, to which defendants do not object, what remains of the plaintiffs' complaint are allegations that the defendants violated various aspects of the Fourth Amendment to the United States Constitution.  42 U.S.C. § 1983 permits a person who has been subjected "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States by an action taken under color of state law to bring suit against the government official who worked the deprivation.  Obviously then, a key question in every

§ 1983 case is whether the Constitution or another federal law has been violated.

But the courts have also interpreted § 1983 to include a "qualified immunity" for government officials who violate constitutional rights that, at the time of violation, were not "so 'clearly established' that a reasonable official would understand that what he is doing violates that right." *Charvat v. E. Ohio Regional Wastewater Authority*, 246 F. 3d 607, 616 (6th Cir. 2001) (citation omitted). To defeat qualified immunity, it is not necessary that "the very action in question has been held unlawful." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see also Lodgson v. Hains*, 492 F. 3d 334, 343 (6th Cir. 2007) ("[p]re-existing law need not address the very question at hand"). What is required is that "in the light of pre-existing law," *Anderson*, 483 U.S. at 640, "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted," *Saucier v. Katz*, 533 U.S. 194, 202 (2001), *quoted in Center for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F. 3d 807, 830 (6th Cir. 2007). In other words, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier*, 533 U.S. at 202, *quoted in Center for Bio-Ethical Reform*, 477 F. 3d at 824. If no reasonably competent officer would have taken the same action, then qualified immunity should be denied; however, "if officers of reasonable competence could disagree on [the legality of the action], immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). To determine whether a right is "clearly established" in this way, a district could must consider "binding precedent from the Supreme Court, the Sixth Circuit, [and] the district court itself," as well as "case law from other circuits which is directly on point." *Barrett v. Harrington*, 130 F. 3d 246, 264 (6th Cir. 1997)

Although there is no longer a legal requirement that a court determine whether the

defendants' actions violated a constitutional right before considering whether the right was "clearly established," *Pearson v. Callahan*, 555 U.S. ---, 129 S. Ct. 808, 818-22 (2009), the Supreme Court has recognized that this is "often beneficial," *id.* at 818, and the Sixth Circuit has said that the inquiry still "generally proceeds" along those lines, *Drogosch v. Metcalf*, --- F. 3d. ---, No. 08-1249, 2009 WL 454606, at *4 (6th Cir. Feb. 25th, 2009).

II.  Probable Cause

The first remaining claim brought by the plaintiffs is that Officer Sassak lied in order to obtain a warrant to search their house, even though the true facts did not establish probable cause for such a search.

A.  Facts

In his affidavit in support of the search warrant, Sassak swore that:

The affiant received information 11/04/2003, from anonymous caller that stated there is a lot of vehicle traffic at the above listed location and that the occupants of the residence are selling narcotics from within the location.

That Affiant set up periodical surveillance at the listed location from 11/10/2003 thru 11/28/2003 and observed high amount of vehicle and pedestrian traffic at the listed location.  Th[at] persons would enter listed location and stay a short period of time, exit the location and leave.

That on 11/21/2003 affiant collected 3(three) bags of garbage that were placed between the sidewalk and curb of the above listed location for scheduled trash pick up.

That he inspected the bags of garbage and discovered coin seals and cellophane bags containing green leafy residue, stems and seeds and mail to listed location.

Affiant field tested sample of green leafy material which tested positive for the presence of Marijuana.

That of 11/28/2003 Affiant collected 2(two) bags of garbage that were placed between the sidewalk and curb of the above listed location for scheduled trash pick up.

That he inspected the bags of garbage and again discovered plastic coin seals and cellophane bags containing green leafy residue, seeds, stems and mail to residence.

Affiant field tested sample of green leafy material which tested positive for the presence of Marijuana.

Search warrant and affidavit, docket no. 82-5.

Cotton and Truesdell claim that Sassak knew the statements about conducting the "trash pulls" to be false at the time he made them. Cotton has submitted an affidavit stating that there could not have been any "mail to listed location" in either of the trash pulls, because he and his mother shredded all of their "personal documents and junk mail" before throwing it away. Cotton aff., docket no. 90-9, ¶ 1. Sassak, however, reiterated at his deposition in this matter that he had found this kind of "residency" in their trash bags. Sassak dep. docket no. 74-6, pp. 74-75.

Cotton and Truesdell also note that they used only white 13-gallon trash bags. Cotton aff., docket no. 90-1, ¶ 2. While Sassak's affidavit does not indicate the appearance of the trash bags that were assertedly pulled, at his deposition Sassak stated that the bags involved in the November 21st pull were black 20-gallon bags. Sassak dep., docket no 74-6, pp. 38-39. Finally, the plaintiffs flatly deny that there was any marijuana in their garbage, or indeed in their house. Cotton aff., docket no. 90-1, ¶ 7; Truesdell aff., docket no. 90-12, ¶ 12. All these discrepancies, say plaintiffs, demonstrate that the trash pulls actually never occurred.

B.  Procedural Posture

The plaintiffs also presented evidence that the surveillance that Sassak swore to never occurred. Magistrate Judge Majzoub, however, recommended a finding that the evidence indicates that the surveillance indeed took place, and that no issue of fact

remains as to that question.  Plaintiffs have not filed an objection to this conclusion, and the Court therefore will not revisit it.  Based on the evidence calling into question Sassak's account of the details of the trash pulls, however, the magistrate did recommend finding that a fact question remains as to whether those pulls actually took place.  Without that evidence, she concluded, there was no probable cause to support the warrant.

Sassak appears to offer two objections to this recommendation.  First, he argues that Cotton and Truesdell have not generated a fact issue as to whether he lied in obtaining the warrant.  Second he seems to claim that even if a jury were to conclude that the trash pulls never occurred, the search would still be supported by probable cause based on the tip and the surveillance.

C.  Analysis

1.  Governing Law

a.  The *Franks* Factors

The Fourth Amendment requires that "no warrants shall issue, but upon probable cause."  In interpreting this provision, the Supreme Court has held that the information presented in support of a search warrant must be "believed or appropriately accepted by the affiant as true."  *Franks v. Delaware*, 438 U.S. 154, 165 (1978).  Thus, in the context of criminal prosecutions, a warrant must be voided, and evidence obtained in a search purportedly conducted pursuant to it must be suppressed as unlawfully obtained, if (1) "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit," and (2) "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause."  *Id.* at 155-56.

Similarly, a defendant in a § 1983 suit accused of an unlawful search "cannot rely on a judicial determination of probable cause [justifying the search] if that officer knowingly ma[de] false statements and omissions to the judge such that but for these falsities the judge would not have issued the warrant." *Yancey v. Carroll County, Ky.*, 876 F. 2d 1238, 1243 (6th Cir. 1989).  In applying this test, the *Yancey* court considered actual deposition testimony from the judges who issued the challenged warrants, on the topic of whether those judges would have issued the warrants in the absence of the alleged false statements in the affidavits.  *Id.* at 1244-45.  In more recent cases the Sixth Circuit has treated the inquiry simply as "whether the accurate portions of [the] testimony suffice to establish probable cause."  *Vakilian v. Shaw*, 335 F. 3d 509, 518 (6th Cir. 2003).[4]  "What remains of the affidavit established probable cause if it provides the magistrate judge with a basis for finding there was a fair probability that contraband or evidence of a crime would be found at the stated location."  *United States v. Mastromatteo*, 538 F. 3d 535, 545 (6th Cir. 2008) (citation, internal quotation marks and alteration omitted).

    b.  Qualified Immunity

The Sixth Circuit has treated the existence of the *Franks* factors – knowing falsehood plus a lack of probable cause when that falsehood is deleted from the affidavit – as also defeating any assertion of qualified immunity on the part of a § 1983 defendant.  The *Vakilian* court stated that "[t]o overcome an officer's entitlement to qualified immunity, . . . a plaintiff must establish: (1) a substantial showing that the defendant stated a deliberate falsehood or showed reckless disregard for the truth and (2) that the allegedly false or omitted information was material to the finding of probable cause." *Vakilian*, 335 F. 3d at

---

[4]  *Vakilian* dealt with the validity of an arrest warrant, not a search warrant, but apparently did so under an identical doctrinal standard.

517.  In fact, although *Vakilian* thus clearly establishes the elements required to overcome the qualified immunity defense, and the Sixth Circuit has addressed false affidavits in the context of § 1983 claims on several other occasions, this Court has been unable to find any Sixth Circuit case that clearly deals instead with the elements of the constitutional violation itself.[5]   *Franks,* however, seems clear that these two factors are also the sole constituents of the Fourth Amendment violation.

Thus, it appears that in this Circuit an officer accused of violating the Fourth Amendment by obtaining a warrant through an affidavit known to be false can enjoy qualified immunity from suit under § 1983 only if he in fact did not violate the Fourth Amendment.  *Vakilian* itself seems to contemplate as much.  In that case, shortly after

---

[5]  *See, e.g., Donta v. Hooper*, 774 F. 2d 716, 718 (6th Cir. 1985) (examining different standards for *liability*, without differentiating between qualified immunity and the underlying constitutional violation); *Yancey v. Carroll County, Ky.*, 876 F. 2d 1238, 1243-44 (6th Cir. 1989) (citing the *Franks* factors as exceptions to the general rule that "[p]olice officers are entitled to rely on a judicially secured warrant for immunity from a § 1983 action"); *Sinick v. County of Summit*, 76 F. App'x 675, 682 (quoting *Yancey* and noting that an officer "faces liability" if the *Franks* factors are present); *Peet v. City of Detroit*, 502 F. 3d 557, 570 (6th Cir. 2007) (noting that "an officer may be held liable under 42 U.S.C. § 1983" when the *Franks* factors are present); *Buda Bros., Inc. v. Walsh*, 22 F. App'x. 423, 432-33 (6th Cir. 2001) (*Franks* factors are required to challenge "[t]he sufficiency of a judicially authorized search warrant"); *Packer v. City of Toledo*, 1 F. App'x 430, 433-34 (6th Cir. 2001) (affirming finding of qualified immunity based on immateriality of falsehoods in affidavit).

One could argue that the requirement that a plaintiff make a "substantial showing" of his case in order to overcome qualified immunity imposes a heightened burden of proof.  Such an interpretation would be an awkward one at best, however.  The phrase is borrowed from *Franks*, in which the Court held that a criminal defendant is entitled to a suppression hearing if he "makes a substantial preliminary showing" that the affidavit includes lies.  At the hearing, however, the court must ultimately order suppression only if the falsity of the affidavit is proved by a preponderance of the evidence.  *Id.*  Thus, in the *Franks* context a "substantial showing" is a *lower* standard of proof than the preponderance-of-the-evidence standard that also applies in civil cases.  Consequently this standard would be completely superfluous if imported into the qualified immunity analysis, unless by using the phrase "substantial showing" the *Vakilian* court meant something very different from the *Franks* Court.  There is no indication that this was the case.

identifying the *Franks* factors as sufficient to overcome a claim of qualified immunity, the court considered whether the question of materiality should have been submitted to a jury. In doing so, it noted *Hill v. McIntyre*, 884 F. 2d 271, 275 (6th Cir. 1989) a previous case in which the Sixth Circuit had stated simply that "[a]n action under § 1983 does lie against an officer" when the *Franks* factors are present, and remanded for a jury trial on the materiality question.   The *Vakilian* court reasoned that this was proper only because in *Hill*, "qualified immunity was not at issue," *Vakilian*, 335 F. 3d at 517, suggesting that the *Franks* factors governed the constitutional question as well.[6]

### 2.  Alleged Misrepresentations in the Affidavit

Here, as noted, Cotton and Truesdell allege that in obtaining the warrant to search their home, Sassak deceived the magistrate by swearing that he had found marijuana residue in trash bags pulled from their curb, when in fact he had not made any such trash pull and did not find any such residue.  Sassak maintains that, with respect to this charge, plaintiffs have not made the showing necessary to overcome his qualified immunity.

The Court agrees with Magistrate Judge Majzoub that plaintiffs have created a jury question as to whether, in his affidavit, Sassak knowingly misrepresented the presence of mail in the trash bags.  At his deposition, Sassak himself acknowledged that it is important to find mail addressed to a suspect residence in a trash pull, "because if the bag

---

[6] This is a somewhat anomalous conclusion, since it appears to run counter to the Supreme Court's established jurisprudence on qualified immunity.  That jurisprudence suggests that, if the constitutional violation consists of fabricating facts in order to establish probable cause for a search, qualify immunity should apply in cases where a reasonable officer could have believed that the accurate portions of the affidavit alone would have established probable cause.  But this result would be equally anomalous, since it would grant a generous benefit of the doubt to police officers who lie in order to obtain warrants.

   This Court's denial of qualified immunity is immediately appealable under 28 U.S.C. § 1291.  *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).

contains residency from that location, that means that more than likely the products that are inside of this garbage bag came from within that location as well." Sassak dep., docket no. 74-6, pp. 74-75. Thus, the presence or absence of such mail in the trash bags would likely have stood out in Sassak's mind as he swore out the affidavit. Cotton has sworn that there would have been no documents with an identifiable address on them in the trash bags, because he and his mother would have shredded all such documents. If this is true -- and a jury could reasonably find that it is -- then it seems likely that the affidavit's statement as to the presence of the mail was simply fabricated.

Although the question is closer, the Court reaches the same conclusion with respect to other aspects of Sassak's warrant application. Cotton testified that he and his mother used white 13-gallon trash bags, whereas Sassak recalled the bags as being black and 20-gallon sized. The Court regards the discrepancy as to the size of the bags to be of little significance. Even if Sassak was wrong by seven gallons about what size garbage bags Cotton and Truesdell used, it remains much more likely that he simply overestimated the capacity of the trash bags that he pulled than that he never pulled them at all (or that he knowingly pulled someone else's 20-gallon bags). The disagreement in the evidence about the color of the bags, however, is more serious. A jury that believed the plaintiffs could reasonably conclude that Sassak never pulled their trash at all, and consequently that he knew at the time he swore out his affidavit that the statements it contained were false.

The Court also reaches the same conclusion with respect to plaintiffs' denials that their trash contained or could have contained marijuana. The record reveals no evidence of the contents of the trash bags Sassak says he pulled other than his own assertions and those of the plaintiffs. Assessing which side is more credible is a task for a jury. The

Court comes to this conclusion with some reluctance, because it will permit plaintiffs in some Fourth Amendment cases to generate issues for trial simply by asserting their innocence of the crime they were suspected of when the search or arrest occurred.  That is what is happening here, at least in part: Cotton and Truesdell state that there was never marijuana in their house, ergo there could not have been marijuana in their trash, ergo Sassak must have been lying when he said there was.  This result is exacerbated in cases involving allegations of deceiving the magistrate, because as described above it appears that qualified immunity offers no extra protection for defendants in such cases.

Be that as it may, the current scheme of statutes and precedents seems to offer no other adequate mechanism for vindicating the rights of innocent persons who are subjected to searches based on false affidavits.  Plaintiffs who have been convicted of a crime will obviously be precluded from asserting their innocence as proof of a defendant's Fourth Amendment liability.  But when a plaintiff was never charged or was acquitted at trial, and who claim that an affidavit's assertion of clear evidence of guilt must be false because they are innocent, under current precedent a trial is the only available means of determining who is telling the truth.

There thus remain questions of fact as to whether Sassak actually found marijuana in the plaintiffs' trash, and indeed as to whether he ever inspected their trash at all.  It remains to be determined whether these questions are material.  In that regard, the question is whether the remainder of Sassak's affidavit established probable cause to conduct the search.  The plaintiffs do not contest the accuracy of Sassak's averment that he received an anonymous tip about drug activity at their address.  Further, they do not object to Magistrate Judge Majzoub's conclusion that there is no substantial issue as to Sassak's good faith in averring that he conducted periodic surveillance of the house over

a period of some weeks, and observed heavy foot traffic consistent with the sale of drugs.

Whether probable cause exists for the issuance of a search warrant is a "commonsense, practical question" that is to be answered through a "totality-of-the-circumstances approach." *Illinois v. Gates*, 362 U.S. 213, 230 (1983). The question, as articulated by the Sixth Circuit, is whether the evidence demonstrates "a fair probability that contraband or evidence of a crime would be found at the stated location." *United States v. Mastromatteo*, 538 F. 3d 535, 545 (6th Cir. 2008); *see also Gates*, 362 U.S. at 238. In *Gates*, the Supreme Court held that when an anonymous tip provides no basis for inferring the tipster's honesty or the reliability of the information it conveys, the tip alone will rarely create probable cause, 362 U.S. at 227, unless it is "corroborated in major part" by independent police observations, *id.* p. 243.

Here, the anonymous tip Sassak recounted in his affidavit consisted of two naked assertions: (1) that there was "a lot of vehicle traffic" at Cotton's and Truesdell's house, and (2) that the occupants were selling narcotics from the house. Sassak's surveillance confirmed the vehicle traffic, but when his statements about the trash pulls are removed from his affidavit, the only independent evidence of narcotics sales was the fact that many of the persons who visited the house on foot stayed for relatively short periods of time. These facts are of course insufficient to create probable cause when considered without the tip. The Court also does not regard the corroboration of the tip's assertion as to vehicle traffic as demonstrating the reliability of the allegation of drug sales. Anyone standing or driving on a public street could observe high levels of "vehicle traffic" near a house, without having any knowledge whatsoever of what was going on inside the house. *Cf. Gates*, 362 U.S. at 245 (corroboration of tip's assertions about "future actions of third parties ordinarily not easily predicted" lent greater credibility to remaining allegations).

In sum, even when considered together, the anonymous tip and Sassak's account of his surveillance would not have established "a fair probability that contraband or evidence of a crime would be found at the stated location." *Mastromatteo*, 538 F. 3d at 545, and this would not have generated probable cause to support the issuance of the warrant. Accordingly, the questions of fact as to whether Sassak's representations about the trash pulls were knowingly or recklessly deceitful are material, and Sassak is entitled to neither qualified immunity nor summary judgment on the merits of the constitutional claim.

II.  Knock and Announce

   A.  Overview.

   Cadez, Sassak and Friarson also object to Magistrate Judge's Majzoub's recommendation that they be denied summary judgment on plaintiffs' claim that they failed to knock on plaintiffs' door and announce their presence before entering the house. Although the other officers had no specific recollection, Sassak testified that they knocked on the door and announced their presence before entering Truesdell's and Cotton's house. Sassak dep., docket no. 74-6, pp. 49, 83.

   As one would expect, Truesdell and Cotton contest this.  Cotton, however, was by his own account asleep in an upstairs bedroom at the time of the entry, Cotton dep., docket no. 82-3, p. 52, and thus his inability to hear a knock does not create a fact question as to whether one occurred.  *See U.S. v. Miller*, 21 F. App'x 397, 400-01 (6th Cir. 2001) (affirming grant of summary judgment in favor of police on knock-and-announce claim where, although occupants of the house testified they did not hear a knock, they all admitted they were asleep at the time of entry).  Truesdell, on the other hand, was lying on a couch in the living room of the house at the time of the entry, with her head only two and a half feet from the door.  She also testified that she was either asleep or trying to go

to sleep at the time the entry occurred.  Evidence on this issue will be examined in more detail below.

B.  Procedural Posture

Magistrate Judge Majzoub first noted that Truesdell does not claim that defendant Herring was present at the front door when the entry occurred.  Therefore, she recommended granting summary judgment in his favor on this count.  The magistrate judge also concluded that Truesdell's and Sassak's testimony directly conflict on the question of whether a knock and announcement actually took place, and thus recommended denying summary judgment as to the rest of the defendants.  In response to this, Cadez argues that Truesdell has not specifically stated that no knock occurred, and thus that no issue of fact exists on the question.  In addition, Cadez, Sassak and Friarson all object that, on Truesdell's own testimony, she was too drowsy to have been able to hear a knock and announcement of police presence.

C.  Analysis

Despite Cadez's objection as to the lack of such evidence, plaintiff Truesdell did testify that she heard no knock or announcement before the police entered her home.  The relevant portion of her deposition transcript, which Magistrate Judge Majzoub noted, R&R at 11, reads as follows:

> Q. I am speaking of this date in November of 2003, when the Ecorse Police and when (sic) the Melvindale Officer came to your house, did you hear anyone knock on the door, prior to them coming in?
> A. No.
> Q. Did you hear--
> A. I didn't know nobody was coming.  If they would have knocked, I'd have let them in. . . .
> Q. And did you hear – Before you saw the officers, did you hear anyone say police?
> A. No.

Truesdell Dep., Docket no. 90-4, p. 159.  Combined with Truesdell's testimony that her head was two and a half feet from the door when the entry occurred, R&R at 11, Docket no. 90-4, at 95-97, this clearly supports the proposition that no knock occurred.[7]

In light of this testimony, the only way to make sense of Cadez's objection is to construe it  as an argument that plaintiffs had adduced no *credible* evidence as to the absence of a knock, because Truesdell equivocated in her deposition testimony as to whether or not she was asleep when Sassak claims the knock occurred.  This argument is identical to the objection lodged by the other defendants, and it is not an insubstantial one.  Truesdell's initial testimony was that at the time of the entry she had just gone to sleep, Docket no. 90-4, at 103, and that the entry woke her.  *Id.* at 104.  If Truesdell was in fact asleep at the time Sassak testified that he knocked on the door, her testimony that she did not hear a knock would be significantly less probative of whether a knock actually occurred.[8]  As Magistrate Judge Majzoub noted, shortly after saying that she had just fallen asleep, Truesdell corrected herself and twice said that she had instead been "trying to go to sleep."  R&R at 11, Truesdell Dep., docket no 90-4 at 105.  When asked in response if she was changing her earlier testimony, however, her response was "either way you want it," *id.*, and shortly thereafter she agreed that "I had just gotten to sleep," *id.* at 106.  By contrast, her affidavit states that she was "trying to fall asleep."  Docket 90-

---

[7]  The Court declines to draw a distinction between testimony that the witness did not hear a knock despite her head being two and a half feet from the door, and conclusive testimony that no knock occurred.

[8]  Plaintiffs speculate that even if Truesdell was asleep, the fact that she was not awakened by a knock on the door indicates that none occurred.   It seems unlikely that this inference alone could generate a genuine issue of fact on this point if it were clear that Truesdell was really asleep, but since it is not, there is no need to decide the question now.

12, ¶ 11.

But despite its ambiguity, this testimony does create an issue of material fact as to whether the knock occurred. Plaintiff Truesdell's words can be interpreted in either of two ways. As is suggested by her "either way you want it," Truesdell dep., docket no. 90-4, p. 105, she may have regarded having "just gotten to sleep" and "trying to go to sleep" as phrases that are not mutually exclusive when used in a broad sense. Under this understanding, her testimony that she had "just gotten to sleep" would be equivalent to a loose statement that she was "trying to go to sleep." *Compare id.* at 103-04, 106 *with id.* at 105. Alternatively, her deposition testimony could simply be understood as self-contradictory – as admitting that she was asleep before the entry, but then first claiming that she was awake at that time, secondly collapsing back into her earlier position, and finally reasserting in her affidavit that she was awake.[9]

Thus, based on her testimony a reasonable jury could find (1) that Truesdell was awake at the time Sassak says he knocked on her door and (2) that she heard no knock despite being two and a half feet from the door. If believed, this evidence would make out a Fourth-Amendment violation, since there is no evidence of any exigent circumstances that might justify an unannounced entry. Moreover, as it is very clearly established that "[u]nder the Fourth Amendment, officers must knock and announce their presence and authority before entering a private residence," *Ingram v. City of Columbus*, 185 F. 3d 579, 588 (6th Cir. 1999), qualified immunity is not available for a violation such as the one alleged by the plaintiffs here. Therefore, Magistrate Judge Majzoub correctly

---

[9] The affidavit is not dated, and so it is impossible to determine conclusively that Truesdell signed it after her deposition. She was deposed on May 22nd, 2007, and both her deposition transcript and her affidavit were attached as exhibits to her response to defendants' motion for summary judgment, which response was filed on May 5th, 2008.

recommended that this issue of material fact precludes summary judgment on the failure-to-knock-and-announce claim.

III.  Excessive Force

Cadez and Sassak object to the magistrate's recommendation that they be denied summary judgment on plaintiffs' claim that they used excessive force in conducting the search.

A.  Facts

Plaintiff Delores Truesdell is in her seventies, and her son Lonnie Cotton appears to be in his fifties.  He experiences some difficulty moving at times due to arthritis.  The plaintiffs' testimony as to what happened during the search, especially Truesdell's, is in many respects rambling, confused, and potentially self-contradictory.  Nevertheless, through their depositions and affidavits the plaintiffs have fairly adduced testimony as to Sassak's and Cadez's actions.  These facts , which follow, are disputed in almost every respect by the defendants.

Sassak and Cadez, as well as the other defendants Friarson and Herring, were part of a group of several officers that broke down Truesdell's door and entered the house wearing masks, with weapons drawn.  Truesdell Dep., docket no 90-4, at 104.  Immediately on entry they encountered Truesdell, who was lying on the couch, and when she started to raise her head one of the officers shouted that he would blow it off unless she stopped.  *Id.* at 107.  Sassak and several other officers, but not Cadez, pointed their guns at her.  *Id.* at 160, 172-73.  Although the police did not disclose who they were or why they were there, *id.* at 174, Friarson and Herring were in uniform, Truesdell Dep., docket no 90-4, at 114; *see also* Comp., docket no. 1, ¶¶ 6-7, and  at some point Sassak accused Truesdell of being a drug dealer, Truesdell dep. at 114.  After entering, Sassak

and Cadez uncovered their faces and asked Truesdell if there was anyone else in the house. *Id.* at 113, 160. She responded that her son (i.e., Cotton) was there, and they put their caps back down, id. at 114, 160, and "ran upstairs," *id.* at 109.

Cotton had been sleeping upstairs, and was starting to get out of bed (slowly, because of his arthritis) when Sassak and Cadez came into the room, masks on and fingers on their gun triggers. Cotton dep., docket no. 90-3, pp. 53, 64. Sassak gave orders along the lines of "put your f***ing arms up, and don't f***ing move, or I'll shoot you," *id.* at 54, and Cadez repeated these orders, *id.* at 105. When Cotton put his arms up, he lost his balance and "fell back in the bed." Either Sassak or Cadez said "I told you not to move," held a gun over Cotton, and told him to "put your arms up and get up." Cotton tried to explain that he needed to use his arms to get up, but eventually managed to get out of bed with his hands up. *Id.* at 54-55. Cotton asked if he might put his glasses on; either Sassak or Cadez told him he could not. *Id.* at 56-57. They then told Cotton, who was bare-chested, to "keep [his] hands up, and walk through the hallway into the living room," *id.* at 58, where he saw uniformed police officers for the first time, *id.* at 60. This was "probably a couple of minutes," *id.* at 135, or "three to four minutes, maybe," *id.* at 60, after Cotton awoke.

Sassak and Cadez brought Cotton downstairs, Truesdell Dep., docket no 90-4, p. 166, and from there the two officers apparently began operating more independently of each other. For the next "10 to 15 minutes," Sassak repeatedly ordered Cotton to "keep [his] hands up and don't f'g [sic] move," *id.* at 128, although after "a few minutes . . . five maybe" Cotton was permitted to sit down, *id.* at 59, and "after awhile," one of the uniformed officers (again, either Friarson or Herring, Compl., docket no. 1, ¶¶ 6-7) brought him his glasses and cigarettes, Cotton dep., docket no. 90-3 at 65. Truesdell had her

hands up, but after "a few moments" she was allowed to lower them.  *Id.* at 128.  About five minutes after Cotton sat down Sassak and Cadez removed their hoods, *id.* at 105-06, revealing their faces to Cotton for the first time.  Finally one of the uniformed officers told Cotton he could lower his hands.  *Id.* at 129-30.

   Sassak photographed Cotton and Truesdell – the latter with difficulty, because she continuously hid her face from the camera.  *Id.* at 124.  At some point during the raid, despite Cotton's pleas that he use more civil language, Sassak began a "tirade" against Truesdell.  Standing very close to her, *id.* at 122, he made multiple threats to arrest her, Cotton aff., docket no. 90-9,  ¶ 14, and said: "we're gonna to put your old f***in' a** out on the street," "we'll take everything your old f***ing a** owns," "you didn't do a very f***ing good job raising them [i.e., Truesdell's children]," "you're running an f'g [sic] dope house," Cotton dep., docket no. 90-3 at 122-23, "you're nothing but a motherf***er," and  "I'm gonna  take your f-ing house."  Truesdell dep., docket no. 904, p. 163.  When Cotton asked Sassak to ease off of his mother due to her health, Sassak responded "I don't give a f***."  Cotton aff. at ¶ 14. To Cotton, Sassak said "f*** you, we know what's going on, this is a f***ing drug house" and "I'll put your momma on the street."  *Id.*  The officers searched portions of the house and a vehicle parked outside, id. at 124-25, and as the search progressed Sassak's voice got louder and "the 'F' words were flying more."  Cotton dep., docket no. 90-3, p. 128.  Throughout the process he acted "a wild man," Truesdell Dep., docket no 90-4, at 164-65;  "He was crazy, he was absolutely nuts," speaking in a loud and unprofessional tone "the whole time."  *Id.* at 168-69.  When Cotton asked if he could see a warrant, Sassak responded that he would leave the warrant in the other room, and that Cotton could look at it after the police left.  *Id.* at 165.

   Cadez, on the other hand, questioned Cotton about Cotton's nephew, Cotton dep.,

docket no. 90-3, pp. 106-07, who Cadez apparently bore a grudge against because Cotton's nephew and Cadez's son had once tried to run away together, *id.* at 110-11. Cotton asked Cadez not to sit on the arm of Truesdell's chair, but Cadez did not move. *Id.* at 112.  Cadez "wasn't over the ballpark like Officer Sassak," and raised his voice only once.  *Id.* at 108.  Cadez never spoke directly to Truesdell, Truesdell Dep., docket no 90-4, at 131-34, did not point a weapon at her, *id.* at 171, and said nothing that Truesdell thought inappropriate, except that "we'll get more than $900 out of this one," *id.*  At one point he started to search Truesdell's purse, but stopped when she asked him to.  *Id.* at 171.

B.  Procedural Posture

Magistrate Judge Majzoub first noted that Cotton and Truesdell make no allegations that either Herring or Friarson used force in any way.  Therefore, she recommended granting summary judgment as to them on this claim.  On the other hand, the magistrate concluded that, based on Cotton's and Truesdell's testimony as to their actions, a jury could find that Officers Cadez and Sassak did use unreasonable force.  Therefore, she recommended denying summary judgment as to them.

In objection, Cadez and Sassak do not appear to challenge the magistrate's conclusions as to what factual findings would be supported by the evidence.  Instead, they seem to argue that even on those facts, their use of force was not "unreasonable" as a matter of law.

C.  Analysis

1.  Governing Law

"[F]or Fourth Amendment purposes . . . a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Michigan v. Summers*, 452 U.S. 692, 705 (1981).  Under *Graham v. Connor*, 490 U.S. 386, 395 (1989), "all claims that law enforcement officers have used excessive force-deadly or not-in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard."  Thus, the use of force by the officers in this case is properly analyzed under this rubric.

In determining whether a use of force is "reasonable" under the Fourth Amendment, a court must consider the totality of the circumstances that faced the officer, *Fox v. DeSoto*, 489 F. 3d 227, 236-37 (6th Cir. 2007), and balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake," *Graham v. Connor*, 490 U.S. at 396.   Among the relevant circumstances are "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (quotation marks and citation omitted).

> [t]he "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . .  "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment.  The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments– in circumstances that are tense, uncertain, and rapidly evolving– about the amount of force that is necessary in a particular situation.

*Id.* at 396-97 (quoting *Johnson v. Glick*, 481 F. 2d 1028, 1033 (2d Cir. 1973).

The Supreme Court has elaborated that  "[e]xcessive force claims, like most other

Fourth Amendment issues, are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred." *Saucier*, 533 U.S. at 207. Therefore, "[i]f an officer reasonably, but mistakenly, believed that a suspect was likely to fight back . . . the officer would be justified in using more force than in fact was needed." *Saucier*, 533 U.S. at 205.

Here, the circumstances indicated that Cadez and Sassak were entering a potentially dangerous situation. There is no dispute that none of the officers knew who lived in the house they were raiding, or had any reason to know that its only occupants were two relatively elderly persons. Thus, given the evidence of drug sales at that address, it was not unreasonable for the officers to act in an assertive manner in order to quickly detain the house's occupants and preclude the possibility of violent resistance to their search. Within a relatively short time of entering the house, however, the officers would have been able to see that neither Truesdell nor Cotton appeared to pose any serious threat of either resisting or destroying evidence. Thus, the level of force that would be permissible to maintain their detention throughout the course of the search would be considerably less than what was reasonable immediately upon entry.

### 2. Officer Cadez

The Court finds that, even reading the record in the light most favorable to Cotton and Truesdell, the facts indicate that defendant Cadez calibrated his use of force to the circumstances in precisely this manner. It was not unreasonable for Cadez to enter a suspected drug house with his gun drawn or with a mask over his face. There is no dispute that Cadez quickly unmasked himself after encountering Truesdell, and that he did not point his weapon at her. In light of the fact that Cadez had no knowledge of Cotton's limited mobility due to his arthritis, it was also reasonable for Cadez to enter Cotton's

bedroom once again masked and with his gun ready to fire, and to use rough language with Cotton to quell the possibility of his resistance.  Even after Cotton fell back into his bed, the Court cannot fault Cadez for requiring Cotton to immediately proceed downstairs without permitting him to put on a shirt or his glasses.  Although Cadez probably knew at this point that Cotton was not in perfect fighting form, allowing Cotton to rummage around in closets or drawers for clothes or glasses could still have quite reasonably seemed tantamount to an invitation to produce a weapon and offer violent resistance.

After Cotton arrived in the living room, however, the record indicates that Cadez moderated his use of force significantly.  In fact, there is almost no indication that he used force of any kind after coming back downstairs from Cotton's bedroom.  The plaintiffs acknowledge that he spoke in a calm, even polite manner.  He apparently spoke with Cotton during the 10- to 15-minute period while Cotton's hands were up, and did not give Cotton permission to lower them.  But the record indicates that it was Sassak, not Cadez, who insisted that Cotton's hands stay in the air during this period.  The Court does not regard Cadez's failure to tell Cotton that he could lower his hands as being unreasonable under the Fourth Amendment.

Therefore, the Court concludes that there is no remaining issue of material fact as to whether defendant Cadez conducted himself unreasonably, under the Fourth Amendment, in the course of seizing the plaintiffs and searching their home.  Accordingly, summary judgment will be entered in Cadez's favor on this issue.


3.  Officer Sassak

The plaintiffs' testimony paints defendant Sassak's behavior in an entirely different light.  Although his actions in entering the house and rousting Cotton from bed were similar

to Cadez's, the plaintiffs assert that Sassak continued conducting himself in the same threatening, violent manner for an extended period of time after entering the house. Nothing about the circumstances indicated the need for requiring Cotton to hold his hands up for fifteen minutes, for launching into extended tirade of shouted profanities, or for repeatedly threatening to kick Truesdell out of her house and expressing indifference to whether his conduct was damaging her health.  The violence of their initial entry, although reasonable in itself, further suggests that Sassak's further actions (as recounted by Cotton and Truesdell) can best be characterized as a needless terrorization of two frightened elderly persons.  Because a jury could reasonably believe the plaintiffs' assertions that Sassak did all these things, it could also  find that his conduct of the search and seizure was "unreasonable" under the Fourth Amendment.

There can be no question that the right to be free of excessively forceful searches and seizures is clearly established.  The Court is also satisfied that a reasonable officer would have understood that the sort of rampage that Cotton and Truesdell claim Sassak engaged in is not permitted under the Fourth Amendment.  Therefore, an issue of fact also remains as to whether Sassak is entitled to qualified immunity, and summary judgment in his favor on the excessive-force claim is not appropriate at this time.

## CONCLUSION AND ORDER

The Court accepts Magistrate Judge Majzoub's recommendation to find that issues of fact remain as to whether Sassak in fact pulled Cotton's and Truesdell's trash off the curb, and if he did so whether the pulled trash contained marijuana.  Therefore, the Court will accept the Report and Recommendation, and deny summary judgment on this issue to Sassak while granting it to Cadez.

The Court also adopts in full Magistrate Judge Majzoub's recommendations in regard

to the knock-and-announce claim.  A genuine issue fact remains as to whether the officers knock and announced their presence.  If they did not, it was a violation of the Constitution. Therefore, summary judgment for Cadez, Sassak, and Friarson will be denied on this issue.  Since Herring was undisputedly not part of the initial entry party, summary judgment will be granted in his favor in this respect.

The Court further adopts Magistrate Judge Majzoub's recommendations as to defendant Sassak on the excessive-force claim.  An issue of fact remains as to whether his conduct comported with Fourth Amendment reasonableness.  As no such issue of fact remains with respect to Officer Cadez, however, the Court will modify the Report and Recommendation to grant summary judgment in his favor on this issue.

**WHEREFORE**, it is hereby **ORDERED** that:

the Court's Opinion and Order of April 9th, 2009, is **WITHDRAWN**;

the Report and Recommendation is **ADOPTED**, as **MODIFIED** herein;

defendants' motions for summary judgment are **GRANTED IN PART** and **DENIED IN PART**, as follows:

With respect to Count I, regarding the existence of probable cause for the search, summary judgment is **GRANTED** in favor of defendant Cadez and **DENIED** to defendant Sassak;

With respect to Count II, regarding the defendants' alleged failure to knock and announce their presence, summary judgment is **GRANTED** in favor of defendant Herring, and **DENIED** to defendants Cadez, Sassak, and Friarson;

With respect to Count III, regarding the use of excessive force, summary judgment is **GRANTED** in favor of defendants Cadez, Friarson, and Herring, and **DENIED** to defendant Sassak; and

With respect to Count IV, regarding due process, summary judgment is **GRANTED** in favor of all defendants.

Summary judgment having been granted in his favor on all claims, defendant Herring will be dismissed from the case.

**SO ORDERED.**

s/Stephen J. Murphy, III
Stephen J. Murphy, III
United States District Judge

Dated:  June 15, 2009

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on June 15, 2009, by electronic and/or ordinary mail.

s/Alissa Greer
Case Manager